In the Interest of E.D.H.

No. ED 84003.

Missouri Court of Appeals,
Eastern District,
Division Four.

July 6, 2004.

Ann P. Hagan, Hagan, Hamlett & Maxwell, Mexico, MO, for appellant.

Gary Lee Gardner, Assistant Attorney General, Jefferson City, MO, for respondent.

Helen G. Fenlon, Mexico, MO, Guardian Ad Litem.

PATRICIA L. COHEN, Judge.

### Introduction

Michael Dewayne Monroe ("Father") appeals the decision of the Circuit Court of

Audrain County terminating his parental rights to his daughter, E.D.H. ("Child"). We affirm.

### Statement of the Facts and Proceedings Below

The court held a hearing on the Amended Petition to Terminate [Father's] Parental Rights on November 19, 2003. Viewed in the light most favorable to court's decision, the evidence adduced at the hearing established that Mother gave birth to Child on December 9, 1998. At the time of Child's birth, Mother and Father were not married. In fact, Father was not aware of Child's birth until the summer of 1999 when Child was approximately six-months old. At the hearing, Father alleged that he had frequent and even extended contact with Child as soon as he learned of Child's birth. However, there is no documentation of the extent of this initial contact.

Prior to Child's birth, the Children's Division of the Division of Family Service ("DFS") maintained an open case on Mother and Child's maternal half sister due to the unsanitary and hazardous living conditions in Mother's home.[1] As a result of DFS's repeated involvement with Mother and Child's maternal half sibling, DFS has been aware of Child since birth.

On February 22, 2001, DFS removed Child and her maternal half-sibling from Mother's unsanitary home.[2] DFS placed Child in the temporary custody of foster parents. DFS records indicate that Father contacted DFS about visiting with Child after the removal. At that time, however, Father did not advise DFS of any prior visits or involvement with Child and likewise did not request that he be considered as an alternative to foster care.

Upon placing Child in foster care, DFS made reasonable efforts to reunite Child with Mother.[3] Due to the fact that Father had not been part of the initial family unit, DFS did not consider reunification with Father a possibility. However, in response to Father's requests, DFS made supervised visitation available to Father. When DFS determined that Father and Child made progress in their visits, DFS provided unsupervised visits. Since removing Child from Mother's home and the placement of Child in foster care, DFS has thoroughly documented both the availability of visitation to Father as well as the number of actual visits Father's has had with Child.

According to the Social Summary prepared by DFS and included in the record, Father entered into written service agreements on April 3, 2002 and May 19, 2003.[4] A case worker mailed a revised written service agreement to Father for the time period of November 19, 2002 through February 18, 2003, however, Father did not sign and return this agreement. Despite both parties' failure to provide copies of the written service agreement, the Social Summary included in the record explains some of the terms of the fully-executed written service agreement. Specifically, Father agreed, inter alia,: (1) not to smoke, or allow anyone else to smoke, around Child because of her asthma; (2) to attend all of Child's doctor's appointments; (3) to work with Child's foster mother to arrange a specific date and time for routine weekly visits with Child; (4) to contact foster mother 48 hours in advance to can-

---

1. Mother and Father have never resided in the same household.

2. Child's maternal half-sibling is not a party to this appeal.

3. Mother voluntarily terminated her parental rights as to Child on March 25, 2003.

4. The record does not contain a copy of any of the written service agreements.

cel visits or make changes to the date or time of visits; (5) to promptly pick up Child for visits and promptly drop off Child at foster mother's home at the designated times; (6) to complete and return Parent Reaction Forms after every visit with Child; (7) to provide funds directly to foster mother so that Child could begin dance and swimming lessons; (8) to provide funds for additional expenses not covered by Medicaid; and (9) to attend all Family Support Team and Permanency Planning meetings.

Rhonda Flick testified on behalf of DFS regarding DFS records and her experiences with Father and his compliance with the terms of the written service agreements. Specifically, Ms. Flick explained that, in light of the fact that Child was in custody for 116 weeks prior to the termination of Father's visitation in June of 2003, Father theoretically had 116 visits available to him prior to termination. DFS records indicate, however, that Father utilized less than twenty of those 116 available visits. Ms. Flick also explained that Father only attended six of the nineteen Family Support Team meetings. Moreover, Father only accompanied Child to one of twenty-nine scheduled doctor's appointments.

The record also indicates that Father has failed to meet his child support obligations. Specifically, on June 15, 1999, Father was ordered to pay child support to Mother in the amount of $283 per month. By January of 2000, however, Father was $2,264 in arrears. As of January of 2001, the arrearage had grown to $5,660. Pursuant to an Order dated September 15, 2001, Father was required to pay $205 per month to DFS Audrain County for Child. Father did not make any payments on this Order between July 2002 and June of 2003. Furthermore, by January of 2002, Father was $9,095 in arrears. In January of 2003,

the arrearage was $12,452 and by October of 2003, the arrearage had grown to $14,999.

On June 3, 2003, the juvenile officer filed a Petition for Termination of Natural Father's Parental Rights. On June 4, 2003, the juvenile officer filed a Motion to Discontinue Visitation and Reasonable Efforts which the court granted that same day. At Father's request, the court appointed counsel. The juvenile officer filed the Amended Petition for the Termination of Parental Rights on November 18, 2003.

The court held a hearing on the Amended Petition. The court terminated Father's parental rights on November 26, 2003, finding, inter alia, that: (1) Child has been in foster care for at least fifteen of the most recent twenty-two months; (2) Child was abandoned in light of Father's failure to consistently pay child support, maintain contact with Child, attend Family Support Team meetings as well as Child's doctor's appointments; (3) Father has, without good cause, left Child without any provision for parental support and without making arrangements to visit or communicate with Child, and failed to pay child support; (4) the written service plan did not contain unreasonable objectives for Father, yet he failed to comply with those plans; (5) Child had emotional ties to Father, but Father's inconsistent visits and total failure to visit from May 2002 to the present has extinguished those ties; (6) Father has paid less than $2,500 in child support since June of 1999 and is in arrears several time that amount; (7) no services would bring about a lasting parental adjustment because Child has never lived with Father; and (8) termination of Father's parental rights is in Child's best interest and clear, cogent and convincing evidence supports termination. Father appealed the termination.

### Standard of Review

■ Our review of a trial court's decision to terminate parental rights is governed by *Murphy v. Carron*, 536 S.W.2d 30 (Mo. banc 1976). We will affirm the judgment of the trial court unless no substantial evidence supports the decision, it is against the weight of the evidence, or it erroneously declares or applies the law. *In the Interest of K.O.*, 933 S.W.2d 930, 934 (Mo.App. E.D.1996). We view facts and reasonable inferences in the light most favorable to the trial court's decision and defer to the trial court's superior ability to determine the credibility of witnesses. *Id.*

■ The court's primary concern in cases involving the termination of parental rights is the best interest of the child. *Id.* Accordingly, a trial court may terminate parental rights only when it finds clear, cogent and convincing evidence to support the termination. *Id.* "Clear, cogent, and convincing evidence is that evidence which tilts the scales in the affirmative and leaves the fact finder's mind with an abiding conviction that the evidence is true." *In the Interest of D.C.*, 49 S.W.3d 694, 698 (Mo.App. E.D.2001).

### Discussion

### A. Abandonment/Neglect

■ In his first point, Father contends that there was insufficient clear, cogent and convincing evidence to support the court's findings that Father abandoned, abused, neglected or otherwise failed Child. In support of his contention, Father first asserts that after DFS placed Child in temporary foster custody, DFS interfered or prevented the Father–Child relationship because the services offered by DFS were unreasonable and disingenuous.

Section 211.447.4(1)(b)[5] provides, a child has been abandoned if, for a period of six months or longer: "[t]he parent has, without good cause, left the child without any provision for parental support and without making arrangements to visit or communicate with the child, although able to do so." Additionally, section 211.447.4(2) provides, a juvenile officer may file a petition to terminate the parental rights when "the child has been abused or neglected. In determining whether to terminate parental rights ... the court shall consider ... (a) [a] mental condition ... which renders the parent unable to knowingly provide the child the necessary care, custody and control; (b) [c]hemical dependency ...; (c) [a] severe or recurrent acts of physical, emotional or sexual abuse towards the child or any child in the family ...; (d) [r]epeated or continuous failure by the parent, although physically or financially able, to provide the child with adequate food, clothing, shelter, or education...." A finding that one of the four factors is present is sufficient to support termination of parental rights. *In the Interest of B.C.K.*, 103 S.W.3d 319, 327 (Mo.App. S.D.2003).

There is clear, cogent and convincing evidence in the record to support the conclusion that Father abandoned or neglected Child. Both abandonment and neglect turn on intent, which may be inferred by Father's conduct. *In the Matter of C.M.B.*, 55 S.W.3d 889, 894 (Mo.App. S.D. 2001). Here, the evidence showed that Father, without good cause, has failed to maintain routine visits or communication with Child. Specifically, of the 116 available visits since Child has been in temporary custody, Father visited Child on less than twenty occasions. At the hearing, Father offered that he missed approximately 56 of the possible visits due to the fact that he was incarcerated from May 24,

---

**5.** All further statutory references are to RSMo (2000) unless otherwise noted.

2001 to June 26, 2001, from May of 2002 through August of 2002, and again from December of 2002 to April 2, 2003. While it is evident that Father could not leave prison in order to visit with Child, nothing prohibited Father from making telephone inquiries or writing letters to Child while in prison. Despite these alternative methods of communication, Father admits that he did not attempt to correspond or make any attempt at contact with Child during his incarcerations.

Likewise, failure to pay child support is evidence from which we may infer parental intent to abandon. *In the Interest of P.L.O.*, 131 S.W.3d 782, 789 (Mo. banc 2004). Here, the record indicates that Father has failed to meet his court ordered child support obligations. Specifically, on June 15, 1999, Father was ordered to pay child support to Mother in the amount of $283 per month. By January of 2001, Father's child support was $5,660 in arrears. Moreover, on September 15, 2001, Father was ordered to pay $205 per month to DFS Audrain County for Child. Father did not make any payments on this Order between July 2002 and June of 2003 and by October of 2003, the arrearage had grown to $14,999.

Furthermore, the record does not support Father's assertion that the services offered by DFS interfered with his ability to have a relationship with Child. Contrary to Father's assertion, the record reveals that it was Father's own inability to maintain a routine visitation schedule and pay child support, coupled with his unwillingness to comply with the reasonable terms of the written service agreement that prompted termination. Specifically, the record reflects that DFS requested, and Father agreed, not to smoke, or allow anyone else to smoke, around Child because of her asthma. However, evidence presented at the hearing indicated that DFS had to terminate visits at Child's paternal grandmother's house because the Child complained of people smoking around her. Despite Child's medical condition, Father also admitted that another individual smoked in the car with him and Child.

DFS also requested and Father agreed to attend all of Child's doctor's appointments, however the record reflects that Father accompanied Child to only one of twenty-nine scheduled doctor's appointments. The record further indicates that DFS requested, and Father agreed, to complete and return Parent Reaction Forms after every visit with Child, however Father did not return any Parent Reaction Forms. DFS further requested, and Father agreed, to provide funds directly to foster mother so that Child could begin dance and swim lessons and also to provide funds for additional expenses not covered by Medicaid, however Father failed to provide any such funds to Child's foster mother. Finally, DFS requested, and Father agreed, to attend all Family Support Team meetings, however Father attended only six of nineteen meetings. Accordingly, there is sufficient clear, cogent and convincing evidence to support the finding that Father abandoned Child and the record does not support Father's contention that the actions of DFS unreasonably interfered with the Father–Child relationship. Point denied.

### B. Best Interest of Child

In his final point, Father contends that the termination of his parental rights was not in the best interest of Child as required by section 211.447.6. In support of his contention, Father asserts that termination was not in Child's best interest because evidence demonstrated that Child is separated from Father and his family who were actively involved in Child's life.

Before terminating parental rights, the court must evaluate: (1) emotional ties to the parent; (2) whether parent has main-

tained regular visitation or contact with the child; (3) extent of payment of the child support or other maintenance for the cost of the child's care; (4) whether the provision of additional services would likely bring about a lasting parental adjustment enabling a return of the child to the parent within a reasonable amount of time; (5) parent's disinterest or lack of commitment to the child; (6) whether parent has been convicted of a felony; and (7) deliberate acts of parent or parental awareness of deliberate acts of another that pose substantial risk of physical or mental harm to the child. Section 211.447.6.

The court properly found that factors one through five are present in this case while factors six and seven do not apply. To restate the evidence as it applies to each of these factors is unnecessarily repetitive. Instead, we acknowledge that the record clearly supports the trial court's conclusions that: (1) Father's inconsistent visits and total failure to visit from May 2002 forward extinguished any previous emotional ties Child had to Father; (2) Father has failed to maintain regular visitation or contact with Child; (3) Father has paid less than $2,500 in child support since June of 1999 and is in substantial arrears; (4) no available services would bring about a lasting a parental adjustment and Child never lived with Father; and (5) Father's actions indicate a lack of commitment or disinterest in Child. Point denied.

### Conclusion

We affirm the judgment of the Circuit Court of Audrain County terminating the parental rights of Father as to Child.

BOOKER T. SHAW, P.J., and LAWRENCE G. CRAHAN, J., Concurs.